

**Entered on Docket
July 03, 2014
EDWARD J. EMMONS, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA**

**The following constitutes
the order of the court. Signed July 3, 2014**

_____
**Charles Novack
U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>DODIE BROOKS GAINES,<br><br>    Debtor. | Case No. 11-60535 CN<br><br>Chapter 7 |
| HILDA LLORENS,<br><br>    Plaintiff,<br><br>vs.<br><br>DODIE BROOKS GAINES,<br><br>    Defendant. | Adversary No. 12-5091<br><br>**MEMORANDUM DECISION ON DENIAL OF DISCHARGE CLAIM** |

In April 2, 3, 4, 11, and 14, 2014, this court conducted a trial in the above adversary proceeding. All appearances were made on the record. The following constitutes this court's factual findings and conclusions of law.

Plaintiff Hilda Llorens has asserted numerous claims for relief under Bankruptcy Code §§ 727(a)(2)(A), (a)(2)(B), (a)(3), (a)(4)(A), and (a)(5) to deny Gaines his Chapter 7 discharge.[1] At trial, Llorens primarily focused on her § 727(a)(4) claims. Given this, the court will provide a

---

[1] Llorens' complaint also included a non-dischargeability claim for relief under Bankruptcy Code § 523(a)(2)(A). The court's order granting Gaines' motion under F.R.B.P. 7052(c) disposed of that claim for relief.

1

general introduction, rule on each § 727(a)(4) error and omission, and then address Llorens' alternative § 727 claims for relief.

Gaines filed his Chapter 7 bankruptcy on November 15, 2011. For many years Gaines made a substantial living purchasing single family residences at trustee's sales, renovating the real property and then selling them in the Bay Area's rising real estate market. Gaines also provided consulting services for parties interested in purchasing homes at trustee's sales, where he would locate the target property, renovate it, and then share in the sales proceeds. Like many a savvy real estate investor, Gaines generally relied upon substantial lines of credit to fund his purchases. Not surprisingly, the "Great Recession" severely affected Gaines' investment strategy and personal income, and Gaines filed his Chapter 7 when faced with the foreclosure of his real estate assets and litigation generated by his failure to pay his unsecured debts.

Plaintiff Hilda Llorens was one such unsecured creditor. Llorens and Gaines were long-time friends, and Llorens occasionally loaned Gaines funds to purchase foreclosure properties. Gaines failed to fully repay Llorens' last series of loans, and she filed a $516,002.92 proof of claim in Gaines' Chapter 7 bankruptcy case.

## I. THE § 727(a)(4) CLAIMS FOR RELIEF

### a. Gaines' Valuation of 17800 Tourney Road.

Gaines and his family resided at 17800 Tourney Road in Los Gatos, California when he filed his Chapter 7 case. Gaines valued the Tourney Road property at $750,000 on his Bankruptcy Schedule A, and his Schedule D indicated that the property was underwater, with secured debt of $866,594.53. Gaines' Schedule A provided the following commentary regarding his residence: "Value per Zillow.com dated November 14, 2011 of $1,380,900, which does not take into account extensive repairs needed to foundation and septic. Recent appraisal of $885,000 is believed to be high."

Jon Richardson served as Gaines' Chapter 7 trustee. At his meeting of creditors, Gaines described the Tourney Road property as a "scrapper" with "almost no value." Richardson, who is an experienced Chapter 7 trustee, requested that Gaines provide him with an appraisal of the Tourney Road property. As stated above, Gaines's appraisal valued the real property at $885,000.

2

MEMORANDUM DECISION ON DENIAL OF DISCHARGE CLAIM
Case: 12-05091   Doc# 75   Filed: 07/03/14   Entered: 07/03/14 13:45:25   Page 2 of 14

Richardson also visited the Tourney Road property, and asked an experienced Intero real estate broker to provide him with an informal market analysis. As a result of these actions, Richardson concluded that there was no value in the Tourney Road property for the bankruptcy estate, and he filed a no asset report on June 14, 2012. On October 22, 2012, Richardson withdrew his no-asset report. Richardson testified that he withdrew the report after being informed by Llorens' bankruptcy counsel that there was substantial value in the Tourney Road property. Three months later, Richardson sold the Tourney Road property to Archstone Real Estate, LLC for $1.3 million. This sale was orchestrated by Llorens' bankruptcy counsel, who took it upon himself to solicit and obtain a buyer for the property. Archstone purchased the Tourney Road property to flip it without any improvements. Notwithstanding a substantial marketing campaign, Archstone did not receive a bonafide offer close to its $1.3 million purchase price, and in February 2014 it voluntarily transferred the Tourney Road property to its secured creditor in lieu of a foreclosure.

Llorens asserts that Gaines' $750,000 valuation and his description of the Tourney Road property as a "scrapper" constituted false oaths under Bankruptcy Code § 727(a)(4) and warrant the denial of his Chapter 7. Gaines had valued the Tourney Road property at $1.75 million in a May 27, 2010 personal financial statement that he submitted to Borel Private Bank & Trust Company as part of his sustained effort to renew his Borel Bank credit line and prevent the Bank from commencing foreclosure proceedings. Llorens did not find it credible nor possible that the Tourney Road property could have lost a million dollars in value over an eighteen month period. Both parties retained expert witnesses to opine on the value of the Tourney Road property. Llorens' expert, Timothy Tolbert, appraised the property at $1.38 million as of January 28, 2013.[2] Gaines' real estate expert, Michael Frangadakis, assigned a $750,000 value as of the November 15, 2011 petition date. Moreover, the court discounts Archstone's testimony that its Tourney Road purchase was a sound business investment, given the fact that, in a rising market, Archstone was unable to sell the property at a reasonable price, forcing it to abandon it to its secured lender.

---

[2] Gaines successfully moved to prevent Tolbert from opining on the value of the Tourney Road property as to any date other than January 28, 2012. Accordingly, his testimony was of little value.

3

MEMORANDUM DECISION ON DENIAL OF DISCHARGE CLAIM
Case: 12-05091   Doc# 75   Filed: 07/03/14   Entered: 07/03/14 13:45:25   Page 3 of 14

This court also heard a copious amount of testimony regarding the Tourney Road property's condition as of the petition date. The evidence clearly established that the adobe residence was in horrendous condition, with an aging, balky septic system (adjectives that should never be used to describe one's sewage system), and significant ground slippage that affected the integrity of the land and the residence.

Bankruptcy Code § 727(a) is designed "to insure that the trustee and creditors have accurate information without having to conduct costly investigations." *Fogal Legware of Switz., Inc. v. Wills (In re Wills)*, 243 B.R. 58, 63 (9th Cir. BAP 1999) (*citing Aubrey v. Thomas (In re Aubrey)*, 111 B.R. 268, 274 (9th Cir. BAP 1990)); *see also*, *Searles v. Riley (In re Searles)*, 317 B.R. 368, 378 (9th Cir. BAP 2004) ("The continuing nature of the duty to assure accurate schedules of assets is fundamental because the viability of the system of voluntary bankruptcy depends upon full, candid, and complete disclosure by debtors of their financial affairs."). "[T]he very purpose of certain sections of the law, like 11 U.S.C. § 727(a), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs." *In re Beauchamp*, 236 B.R. 727 (9th Cir. BAP 199) (citations omitted). Given the severe sanction of this code section, discharge provisions are liberally construed in favor of the debtor and strictly against the objecting creditor. *In re Khalil*, 379 B.R. 163, 172 (9th Cir. B.A.P. 2007).

Bankruptcy Code § 727(a)(4)(A) provides in pertinent part that "The court shall grant the debtor a discharge unless . . . the debtor knowingly and fraudulently, in or in connection with the case –(A) made a false oath or account. . . . Accordingly, this court may deny a Chapter 7 debtor's discharge if (1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) this oath was made knowingly; and (4) the oath was made fraudulently. Llorens must establish these elements by a preponderance of the evidence. *In re Retz*, 606 F.3d 1189, 1197 (9th Cir. 2010) (*citing Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 882 (9th Cir. BAP 2005)); *In re Coombs*, 193 B.R. 557, 560 (Bankr. S.D. Cal. 1996) (*citing In re Bodenstein*, 168 B.R. 23, 27 (Bankr. E.D.N.Y.1994)).

A false oath may involve an affirmatively false statement or an omission from a debtor's bankruptcy schedules or statement of financial affairs. *Searles*, 317 B.R. at 377. A material fact is

4

one that "bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of of the debtor's property." *Khalil*, 379 B.R. at 173. Notwithstanding this broad definition, a "false statement or omission that has no impact on the bankruptcy case is not material and does not provide grounds for relief for denial of a discharge under § 727(a)(4). *Id* at 172. An act is done "knowingly" when the debtor acts "deliberately or consciously." *Id* at 173. Finally, a fraudulent oath or omission is made when the (1) debtor makes a misrepresentation or an omission; (2) that at the time he or she knew was false; and (3) with the intention and purpose of deceiving creditors. *Id*. Courts typically rely on circumstantial evidence to demonstrate this intent. *In re Devers*, 759 F.2d 751, 753-54 (9th Cir. 1985). Recklessness alone does not establish a debtor's fraudulent intent. It can, however, form a part of the circumstantial evidence typically used to establish fraudulent intent. *Khalil*, 379 B.R. at 173.

Llorens has not met her burden of proof with regard to Gaines' $750,000 valuation and his comments that the Tourney Road property was a "scrapper."[3] Simply, Gaines' $750,000 valuation and belief that the Tourney Road property may not have any real value was not a misrepresentation, nor was it uttered to deceive the Chapter 7 trustee or his creditors. The most telling evidence of this was Richardson's initial evaluation that the Tourney Road property had no value for the estate. Richardson, whose objective is to find value, did not believe after (1) receiving Gaines' $835,000 appraisal, (2) inspecting the property, and (3) discussing the property with a local Intero real estate agent, that the Tourney Road property had any value for the estate. The $1.3 million Archstone offer, which was orchestrated by Llorens' attorney, was "manna from heaven" for the bankruptcy estate, and vastly overstated the property's true worth. Had it been anything else, Archstone would have profitably flipped the property in a rising market.

As to Gaines' $1.75 million valuation in his May 2010 financial statement, no expert testimony was introduced regarding the accuracy of this number, nor the rate by which Los Gatos real property may have declined (or not) during this eighteen month period. Frangadakis was the

---

[3] This also holds true for any similar comments made by Gaines during his 2004 examination or deposition.

5

only expert who valued the Tourney Road property as of the petition date, and his assessment concurred with Gaines' valuation on his Bankruptcy Schedule A. The court found Frangadakis to be a credible witness.

**b. Gaines' Household, Jewelry and Office Equipment Valuation.**

On his Bankruptcy Schedule B, Gaines listed $3,000.00 of household furnishings, $300 of jewelry, and $500.00 of office equipment, which consisted of a computer, laptop, and a model 8860 xerox printer. As is typical of debtors in the Northern District of California, Gaines did not specifically itemize his jewelry or household furnishings on Schedule B. Gaines does not wear any jewelry, and the jewelry referenced on his Schedule B is worn by his wife. This jewelry includes at least one diamond ring and a pair of earrings. The only evidence of these items were a) several pictures posted by Gaines' wife on her Facebook page with her children, b) Gaines trial testimony, which indicated that his $300 valuation was, at best, guess work, and c) Llorens' trial testimony, during which she described the jewelry[4]. Llorens is not a expert gemologist, and she did not provide any competent evidence as to their value.

The evidence regarding the office equipment is even scantier. Gaines testified that his office equipment was several years old, and no one provided this court with any meaningful testimony regarding the office equipment's value as of the petition date.

The parties did, however, provide more extensive evidence regarding Gaines' household furnishings. Gaines owned three residences when he filed his Chapter 7, and he testified regarding how these residences were furnished. Llorens was also familiar with some of these residences, and she, too, testified regarding their furnishings (at least as of 2009), and also provided a video of the interior of Gaines' property in Little River, California. Llorens did not, however, provide any meaningful evidence regarding the value of these furnishings or what furniture Gaines actually owned as of the petition date.

Llorens asserts that Gaines knowingly and fraudulently undervalued his household

---

[4] Llorens testified that Gaines' wife owned a wedding ring and band, a three diamond ring, diamond stud earrings, and a jade pendant. The pictures only displayed a ring and earrings.

6

**MEMORANDUM DECISION ON DENIAL OF DISCHARGE CLAIM**
Case: 12-05091  Doc# 75  Filed: 07/03/14  Entered: 07/03/14 13:45:25  Page 6 of 14

furnishings, jewelry and office equipment, and that this conduct requires that this court deny him his Chapter 7 discharge under § 727(a)(4)(A). Llorens has not met her burden of proof on these claims. Llorens did not provide sufficient evidence that Gaines in fact undervalued these items (and thus misrepresented their value), or that if he did, he did so fraudulently. Absent competent evidence regarding these items' value, and that Gaines knew he was undervaluing them, this court cannot find that these Schedule B entries constituted false oaths.

### c. Gaines' Cash Balance.

Gaines listed several bank accounts and $300 in cash on his Schedule B. On November 14, 2011, the day before he filed his Chapter 7, Gaines withdrew $4,417.36 in cash from his US Bank account, an amount far in excess of the cash balance listed on his Schedule B. Gaines provided several, inconsistent explanations regarding why he did not list this cash on his Schedule B. Under direct examination, Gaines testified that he did not know what he did with this cash. Later, Gaines testified that he withdrew the money to pay bills (possibly through cashier's checks), but he could not identify which bills or provide evidence of payment. Gaines' Schedule C indicates that these funds would not have been exempt.

Gaines' inconsistent testimony leads this court to conclude that he did not use those funds to pay bills before his bankruptcy filing, but instead retained the cash for his own post-petition use. Gaines' failure to list this cash is grounds to deny him his Chapter 7 discharge under §727(a)(4). Gaines knew he had the cash, knew he was required to list it on his Schedule B and failed to list it. Moreover, the amount of cash at issue made this omission a material fact, since the Chapter 7 trustee would have used this cash to increase the disbursements to unsecured creditors. Finally, Gaines fraudulently omitted this cash from his Schedule B to ensure that he, and not his creditors, could benefit from it. Accordingly, this court finds in Llorens' favor on this § 727(a)(4) claim for relief.

### d. Gaines' Interest in Aloui, LLC.

Gaines listed on his Schedule B a 100% interest in an entity known as Aloui, LLC, which he to receive his consulting income. While he listed Aloui on Schedule B, he did not list it in response to question no. 18 on his Statement of Financial Affairs, which required Gaines to identify each business in which he was an officer, director, partner, sole proprietor, or in which he owned five

7

MEMORANDUM DECISION ON DENIAL OF DISCHARGE CLAIM
Case: 12-05091   Doc# 75   Filed: 07/03/14   Entered: 07/03/14 13:45:25   Page 7 of 14

percent or more of the voting or equity interest. Gaines testified that this omission was an oversight, and that he relied on his counsel to adequately complete his Statement of Financial Affairs with the information that he provided to them.

Llorens asserts that this failure to list Aloui (and also to identify himself as a sole proprietor) constitute false oaths. This court disagrees. Gaines listed his 100% interest in Aloui on his Schedule B and valued it. Gaines retained experienced bankruptcy counsel to file his Chapter 7, and this failure to import data from Schedule B to the Statement of Financial Affairs is more counsel's failure than Gaines' omission. Simply, there is insufficient evidence for this court to conclude that Gaines intended to deceive his creditors by this conduct.

**e. Gaines' Transfers to Vince Sakowski, Binder & Malter, Borel Bank, Llorens and Jim Nolan.**

Llorens asserts that Gaines committed false oaths when he failed to list several transfers in his responses to question nos. 9 and 10 on his Statement of Financial Affairs. Question no. 9 required Gaines to list all of his payments to his insolvency counsel, Binder & Malter in the year before his Chapter 7 filing. Gaines listed four such payments, totaling $67,266.76. In truth, Gaines actually paid Binder & Malter another $29,129.13 on December 3, 2010 (which would have been the earliest payment required to be disclosed). While Gaines conceded that he should have listed the December 2010 payment, he stated that this was an innocent oversight. The court agrees with Gaines. Binder & Malter is an experienced bankruptcy law firm, which should have known exactly how much it was paid during the year before the Chapter 7 filing. It was the law firm, not Gaines, which prepared the Statement of Financial Affairs, and the law firm was responsible for this mistake. Llorens did not provide any evidence that this omission was fraudulent or that Gaines sought to deceive this creditors by this omission.

Llorens also argues that Gaines fraudulently omitted several material transfers from his response to question no. 10 on his Statement of Financial Affairs. Question no. 10 requires a debtor to "[l]ist all ... property, other than property transferred in the ordinary course of business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of the case. Gaines listed three such transfers to Borel

8

1  Bank. In March 2011, Gaines was doggedly seeking to renew his Borel Bank line of credit and
2  resolve his financial defaults with the bank. As part of that process (during which he was
3  represented by Binder & Malter), Gaines and the bank signed a March 31, 2011 settlement
4  agreement pursuant to which Gaines transferred three parcels of real property to the bank (on which
5  the bank already held second deeds of trust). These are the three transfers listed on his Statement of
6  Financial Affairs. Gaines did not disclose, however, that he granted the bank a security agreement in
7  February 2010 in his right to receive income from nine foreclosure consulting projects. In 2010,
8  Gaines had a consulting agreement with Worthing Capital, under which Gaines was entitled to
9  receive 50% of the net sales proceeds of foreclosure properties purchased by Worthing Capital that
10 Gaines renovated. On February 1, 2010, Gaines signed a "Pledge and Security Agreement" whereby
11 he granted Borel Bank a security interest in his Worthing Capital projects. Borel Bank recorded a
12 UCC-1 with the California Secretary of State to perfect its security interest. Gaines testified that this
13 transfer was one of his earliest attempts to pacify the bank and avoid a default on his line of credit
14 by providing it with additional security.[5] Gaines retained Binder & Malter to assist him with the
15 Pledge & Security Agreement.

16    Llorens contends that Gaines' failure to disclose the Pledge & Security Agreement was a
17 false oath under § 727(a)(4). Gaines should have listed the Pledge and Security Agreement on his
18 Statement of Financial Affairs, as the Pledge was not made in the ordinary course of his business or
19 financial affairs. Moreover, his initial explanation - that he did not believe that his right to the 50%
20 split constituted "property" - is suspect[6]. Llorens has not, however, demonstrated by a
21 preponderance of evidence that Gaines omitted this information with an intent to defraud or deceive
22 his creditors. Gaines signed the Pledge & Security Agreement almost two years before he filed his
23 Chapter 7, and clearly his largest creditor and bankruptcy counsel were aware of it. Worthing
24 Capital terminated the consulting agreement some time before Gaines filed the Chapter 7, and the

---

[5] Gaines' problems with Borel Bank were caused in part by Llorens' Superior Court collection action against Gaines, in which she obtained pre-judgment writs of attachment. These writs violated his covenants with Borel Bank.

[6] In fact, his omission borders on the reckless.

9

**MEMORANDUM DECISION ON DENIAL OF DISCHARGE CLAIM**

Pledge & Security Agreement would not have had and did not have any bearing on the administration of his Chapter 7 bankruptcy. Gaines repeatedly testified that he relied on his bankruptcy counsel to complete the Statement of Financial Affairs with the information that he provided to them. Binder & Malter was aware of the Pledge & Security Agreement, and why it omitted this information is best posed to the lawyers who prepared the bankruptcy filing.

Gaines also omitted to list several payments in response to Question no. 10. As stated above, Llorens sued Gaines for breach of contract in November 2009 when he failed to repay all of her loans. Llorens obtained and recorded pre-judgment writs of attachment against Gaines' real property, which placed him in default with Borel Bank. Gaines sold property in late 2009 and made several payments out of the sales escrows to Llorens or her attorney, Jim Nolan, to release some of these writs, including a $26,391.69 payment on December 30, 2009 from the sale of 50 Mountain View Road in Watsonville, CA, and a $24,877.98 payment on December 7, 2009 from the sale of 144 College Road in Watsonville, CA. While these sales were in the ordinary course of Gaines' business as a foreclosure consultant, his payments to Llorens/Jim Nolan were not.[7] Again, Gaines' explanation for this omission - he did not think that money was "property" - are dubious. The court concludes, however, that these omissions were not made with the intent to defraud or deceive creditors. Nolan and Llorens knew of (and in fact received) these payments, and Gaines had no financial or personal reason to omit them from his Statement of Financial Affairs. This was yet another oversight without any fraudulent intent, and the court finds that Llorens has not proven by a preponderance of the evidence that this omission constituted a false oath.

The same holds true with regard to Llorens' allegations regarding Gaines' payment to Vince Sakowski. On May 20, 2010, Gaines withdrew $200,000 from his U.S. Bank account in the form of a cashiers check and delivered it to Vince Sakowski. Gaines testified without contradiction that Sakowski provided him with $200,000 to bid on foreclosure property at a trustee's sale. Gaines testified that he returned these funds when he did not buy the foreclosed property. Given Gaines'

---

[7] The parties stipulated at trial that Gaines' real estate sales within the two years of his Chapter 7 filing were all within the ordinary course of his real estate business.

10

1  line of work, this transfer was within the ordinary course of business, and as such, its disclosure was
2  not required by Question no. 10 on the Statement of Financial Affairs. Thus, there was no
3  misrepresentation or omission, and no false oath.

### f. Gaines' Financial Statement

On or about May 27, 2010, Gaines provided Borel Bank with an extensive financial statement as part of his effort to renew his credit line. The financial statement extensively described Gaines' personal and real property assets. Interestingly, Gaines referred to his real property holdings in this financial statement as his "inventory." Gaines did not disclose this financial statement in response to Question no. 19d on his Statement of Financial Affairs. Gaines testified that this omission was an "oversight."

Llorens did not establish by a preponderance of the evidence that this omission was fraudulent, and she thus cannot establish that it constituted a false oath. While the financial statement appears to have included all of Gaines' assets at that time, it was very much outdated by the time of the Chapter 7 filing. Much of the real property listed was sold in the ordinary course of Gaines' real estate business before he filed his Chapter 7, and it does not list any personal property that cannot be found on Schedule B. While Llorens used the financial statement's Tourney Road valuation as proof that Gaines' fraudulently valued that property on his Schedule A, this court has already rejected that argument. While this court remains perplexed by Gaines' failure to understand and comply with the straightforward requirements of his bankruptcy documents, Llorens has not established by a preponderance of the evidence that this Gaines fraudulently omitted this financial statement in order to deceive his creditors. All the assets listed on the financial statement that remained were disclosed on his Schedule A and B when he filed his bankruptcy.

### g. The "Inventory."

Llorens' penultimate § 727(a)(4) contention is that Gaines failed to disclose his real property inventory as required by Question no. 20. This question requires that a debtor "[l]ist the dates of the last two inventories taken of your property, the name of the person who supervised the taking of each inventory, and the dollar amount and basis of each inventory." Question 20(a) requires that a debtor list the inventory date, the inventory supervisor, and the dollar amount of the inventory, be it

11

"cost." "market," or any "other basis." Since Gaines described his real property holding as his "inventory," Llorens contends that he should have affirmatively responded to Question no. 20. Gaines did not respond to this question.

The term inventory applies to personal goods, not real property assets. Gaines' response of "none" to Question no. 20 was accurate, and thus not a false oath.

### h. Gaines Charitable Donation.

Llorens' final § 727(a)(4) allegation arises from Gaines' failure to list a two thousand dollar charitable donation that he made on November 22, 2010 in response to Question no. 7 on his Statement of Financial Affairs. Gaines testified that he donated this money to a Vietnamese charity, which was part of Gaines' long standing relationship with Vietnamese charitable endeavors. Given his history with Vietnam, Llorens did not prove by a preponderance of the evidence that this omission was intended to defraud or deceive his creditors.

## II. LLORENS' REMAINING § 727 CLAIMS FOR RELIEF

While Llorens primarily focused on her § 727(a)(4) claims for relief, her complaint also alleged claims under §§ 727(a)(2)(A), (a)(3), and (a)(5). Llorens seemingly abandoned these claims at trial, and she introduced little, if any evidence that addressed these claims. The court agrees with Gaines' analysis of these claims in his closing brief, and finds that Llorens did not establish these claims by a preponderance of the evidence.

Under § 727(a)(2), a creditor must demonstrate that a debtor transferred or concealed property with the intent to hinder, delay or defraud a creditor. See *In re Retz*, 606 F.3d 1189 (9th Cir. 2010). While Gaines did transfer a substantial amount of real property in the year before he filed his Chapter 7, there is insufficient evidence to conclude that he did so with the intent to hinder, delay or defraud Llorens or any other creditor. As this court explained in its order granting Gaines motion for judgment under F.R.B.P. 7052(c), Gaines' real property sales and payments to creditors other than Llorens were not fraudulent, but instead represented his effort to save his business. Indeed, Llorens stipulated during trial that the real estate sales documented by exhibits 29 through 39 were transfers in the ordinary course of Gaines' business. The only non-business related personal property transfer raised by Llorens during trial was his two thousand dollar charitable donation, and Llorens did not

12

**MEMORANDUM DECISION ON DENIAL OF DISCHARGE CLAIM**
Case: 12-05091    Doc# 75    Filed: 07/03/14    Entered: 07/03/14 13:45:25    Page 12 of 14

present any evidence indicating that this transfer was for anything other than charitable purposes. Llorens also did not introduce any substantial evidence that Gaines removed, destroyed, or mutilated any property within a year of the bankruptcy filing with fraudulent intent. Simply, whatever transfers he made, he did not make them with the intent of defrauding a creditor or the Chapter 7 trustee. Accordingly, this court finds against Llorens on her §727(a)(2)(A) and (a)(3) claims for relief.

Finally, Llorens did not satisfy her burden of proof on her § 727(a)(5) claim for relief. This code section authorizes this court to deny a chapter 7 discharge if the debtor "has failed to explain satisfactorily before determination of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities." Llorens did not present any evidence that Gaines refused to provide the Trustee or any other interested party with documentation and explanations regarding the loss of his real property assets and why he could not satisfy Llorens' and other creditors' debts.

Llorens' counsel shall prepare an appropriate judgment consistent with this court's findings of fact and conclusions of law.

**\* \* \* END OF ORDER \* \* \***

13

MEMORANDUM DECISION ON DENIAL OF DISCHARGE CLAIM
Case: 12-05091    Doc# 75    Filed: 07/03/14    Entered: 07/03/14 13:45:25    Page 13 of 14

**COURT SERVICE LIST**

Recipients are ECF participants

Dodie Brooks Gaines
P. O. Box 1399
Los Gatos, CA 95031

John W. Richardson
5161 Soquel Dr. #F
Soquel, CA 95073

Charles P. Maher
McKenna Long and Aldridge LLP
121 Spear St. #200
San Francisco, CA 94105

14

**MEMORANDUM DECISION ON DENIAL OF DISCHARGE CLAIM**
Case: 12-05091    Doc# 75    Filed: 07/03/14    Entered: 07/03/14 13:45:25    Page 14 of 14